Filed 5/28/15  P. v. Ortiz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

## (Butte)

----

| | |
|---|---|
| THE PEOPLE, | C070982 |
| Plaintiff and Respondent, | (Super. Ct. No. CM031995) |
| v. | |
| TRAVIS MICHAEL ORTIZ, | |
| Defendant and Appellant. | |

Defendant Travis Michael Ortiz appeals following his conviction of murder with personal and intentional use and discharge of a firearm resulting in death.  (Pen. Code, §§ 187, subd. (a), 12022.5, subd. (a), 12022.53, subds. (b)-(d); unless otherwise stated, statutory references that follow are to the Penal Code.)  Defendant contends the government's delayed disclosure and loss of potentially exculpatory evidence compromised his right to due process of law, presentation of a defense, and effective assistance of counsel.  Defendant also argues the trial court erred in allowing into

1

evidence (1) a gun found in his car days after the shooting and (2) uncharged offenses to show motive. We affirm the judgment.

Bridget Castillo witnessed the murder of her boyfriend, Skhy Abrahamian, on a sidewalk on January 2, 2010, around 10:00 p.m.

Defendant's first trial which took place in November 2011 ended in a mistrial when the jury deadlocked at four guilty and eight not guilty.

At the second trial, Bridget said she went with her baby that night to see the victim at the apartment of his business partner, Nick Patti. Patti was not at the apartment. Though given immunity in return for her testimony, Bridget testified she was unaware at that time that the nature of Abrahamian's and Patti's business was growing and selling marijuana.

Going to the apartment, Abrahamian was nervous due to an earlier unexpected visit from someone named "Corky," who was not defendant. Abrahamian walked Bridget to her car. Defendant -- whom Bridget has known for 15 years and identified in court -- drove up in a silver SUV, left it running with the lights on, got out, and wanted to talk to Abrahamian. Defendant was wearing a baseball cap backwards. Defendant and Abrahamian were members of the Norteño street gang and had business dealings together.

Defendant said, "let's go in the house." Abrahamian did not want to go inside. The two men walked away from the car, but Bridget could still see them. She was nervous because defendant was not acting normal; he was sweating and agitated. As Bridget waited in the car, she heard Abrahamian ask, "Why do you have your hands in your pocket? What's wrong?" Bridget phoned her brother Nathan, whose testimony confirmed her unease. Abrahamian came back to Bridget's car to get his house key, told her to go home, and walked away from the car.

2

Bridget looked down at her phone, heard a gunshot, looked up, and saw Abrahamian fall to the ground. She ran to him. Defendant just looked at her "like whatever." He put his hands underneath his sweater, but Bridget was more focused on his eyes. Defendant got in the SUV and drove off.

Because she was afraid of defendant's gang connections, Bridget lied when she initially told police she did not know the shooter. Gang culture bans cooperating with police. That night, Bridget told her brother Nathan that defendant shot the victim, and Nathan told a third person, who called police. Bridget also told her brother that she saw the muzzle flash of defendant's gun going off, saw the victim fall to the ground, saw defendant tuck the gun away while standing over the victim and staring at her.

Nick Patti testified he was walking home when he heard the gunshot and screams from half a block away. He saw the victim's body on the ground from about 10 feet away and and ran away. Patti had been walking home after running away 10 or 15 minutes earlier when defendant drove up in a silver SUV, pointed a silver revolver, yelled and threatened to "dome" Patti, i.e., shoot him in the head, if he did not get in the vehicle.

Neighbors in their apartments heard the yelling and later heard the gunshot and saw a silver SUV drive away.

Upon hearing the suspect vehicle might be a silver Mitsubishi Montero, a police sergeant knew such a vehicle was associated with Norteño gang member Erick Lara and owned by Erick's relative Rafael Lara. The sergeant located the SUV parked outside Rafael's address. He did not check whether the hood was warm.

Based on reports the SUV might be a rental, police checked with rental companies and learned defendant was an authorized driver on a silver Pontiac Torrent SUV rented to his relative Serapio Ortiz. On January 6, 2010, police saw defendant return the Pontiac SUV to the rental office.

3

On January 9, 2010, police arrested defendant in his Trailblazer. He had $1,400 in cash and a stainless steel Ruger .357 Magnum revolver on the right rear passenger floorboard. The gun was loaded with five hollow point bullets.

The pathologist testified the victim was shot in the back of the head at close range, about one-and-a-half to three feet, at a slightly downward angle. He had an exit wound in his forehead. No bullet or fragments were recovered from his body. The pathologist opined the wound was made by a medium caliber bullet, approximately .9 mm., .38 mm., or .357 mm., but not .45 mm. or .22 mm.

Over defense objection, the trial court allowed the prosecution to present evidence of three uncharged offenses involving defendant.

Patti, who testified under a grant of immunity, told the jury he committed a robbery with defendant and the victim in December 2009. Defendant needed money and wanted to rob a woman with whom the victim dealt drugs. Defendant's brother, Scott Ortiz, arranged to have the woman bring 40 pounds of marijuana to Scott's apartment for an ostensible sale. Defendant, the victim, Nick Patti, and "Corky" waited outside. The woman drove up and sent her two "kids" (ages unknown) to knock on the door. When no one answered, they headed for the car. Defendant and Corky, each armed with a gun, stopped them. Defendant grabbed one and pushed the other, then had the two "guys" lay on the ground. Defendant and Corky grabbed the marijuana. The four cohorts went to Corky's and divided the loot. Each agreed to pay Scott $1,000 for helping set up the robbery.

Later that month, defendant visited Patti and asked to see the marijuana. Patti displayed about 20 pounds of marijuana. Defendant asked if Patti and the victim had the money to pay Scott. Patti said they were having trouble selling the marijuana because it was poor quality. Defendant asked Patti to call the victim. When Patti looked down at his phone, defendant hit him with something and knocked him out. When Patti came to, defendant was gone and so was the marijuana.

4

The third uncharged offense was that, 10 or 15 minutes before killing the victim, defendant pointed a silver gun at Patti and threatened to "dome" him (shoot him in the head) if he did not get in the SUV.

The prosecution rested its case. After a recess, the prosecutor told the court he had just learned that Edward Hastings, a neighbor who saw an SUV drive away after the gunshot, had called police days after the murder to report he saw the shooter and SUV at a gas station. This was news to the prosecutor, who contacted police and was told no such report was found. Upon further inquiry, certain law enforcement officers remembered having received the information. Police obtained and viewed the gas station surveillance video, identified the person as Erick Lara, a Norteño gang member whose relative Rafael Lara owned a silver Mitsubishi Montero. The police eliminated them as suspects. The prosecutor wrote his own report and disclosed it to defense counsel.

The police lost the video.

Hastings had not been called as a prosecution witness at the second trial. He did testify at the first trial but was not asked about the report of the SUV.

After proceedings to fashion a remedy for the government's prior failure to disclose this evidence (which we discuss *post*), the defense called Hastings as a witness. He was on his porch on the night of the shooting, drinking Hennessy's whiskey and smoking marijuana. He was "pretty drunk." He heard and saw a man in the driver's seat of a silver Mitsubishi Montero SUV yelling at a man standing on the curb. The street was dark, with only one streetlight, on the other side of the street. The driver was wearing a baseball cap, and Hastings did not see his face. The pedestrian jogged away, and the vehicle left. Ten or 15 minutes later, Hastings was inside his home, heard "fireworks" and screaming, looked out his window, and saw the same vehicle pull away from the curb. In the light of a passing car, Hastings caught a glimpse of the driver, who was a White or light-skinned Hispanic male with a goatee, wearing a baseball cap.

5

Hastings was certain the silver SUV was a Mitsubishi Montero. He thought it might be a rental, because it was clean and new. It was in better shape than a neighbor's silver Mitsubishi Montero that was parked on the street at the time of the shooting. Hastings is knowledgeable about vehicle makes and models. The police tested his talent by having him identify photos of vehicles with logos obscured. Hastings repeated the test in court, got three out of 12 wrong and offered two answers (one right and one wrong) for each of two other photos.

That night, police took Hastings to view the silver Montero associated with Norteño gang member Erick Lara. Hastings said it was similar but could not identify it as the suspect vehicle. A stipulation was read to the jury that Erick Lara, a Norteño gang member, was convicted of shooting a .38 caliber revolver at a house occupied by a Sureño gang member on May 28, 2010.

Two days after this murder, Hastings was at a gas station, where he saw a man who looked like the shooter. The man wore a baseball cap and was walking from an SUV to the entrance. The SUV was a silver Mitsubishi Montero. "[W]hen I saw the vehicle and I saw the guy, it just made me think of [the murder]." He first said he saw the man and the SUV at the same time but, when shown a document to refresh recollection, said he saw the person first. In court, Hastings learned the SUV at the gas station was the same SUV he had been unable to identify for police the night of the murder. He testified he had forgotten that the police took him to see an SUV.

In this trial testimony two years after the murder, Hastings could not say for sure if the man at the gas station was the shooter and could not remember what it was about the man at the gas station that made him think he was the shooter.

Police Sergeant Rob Merrifield testified the license number reported by Hastings belonged to the Lara vehicle. Hastings reported he saw the subject and then the vehicle. Merrifield made a report, turned it over to his supervisor, and has since become aware the report was never given to defense counsel. The report did not get into the police master

6

file and was not disclosed to the district attorney's office. Merrifield found his copy in his own personal computer bank. Merrifield was surprised at not being subpoenaed to testify at prior hearings, but he kept his mouth shut.

When requested to do so, Detective James Parrott checked police logs for a record of Hastings's phone call but found nothing. The logs would not show a call made to Sergeant Merrifield's cell phone. When asked to check the logs, Parrott did not mention having watched the video because he forgot he had watched the video. He looked at a photograph of Rafael Lara the morning of his testimony and now remembered that the person on the video was Rafael Lara. Erick Lara was a passenger in the vehicle when it was stopped by police in August 2009.

Police detective Scott Harris testified he showed Hastings a photo lineup of six men, including defendant, and Hastings did not identify anyone as the shooter. Neither was Lara included in the lineup.

The jury found defendant guilty of first degree murder and found the gun enhancement allegations true.

The trial court sentenced defendant to 25 years to life for murder plus 25 years to life for personally and intentionally discharging a firearm causing death (§ 12022.53, subd. (d)). The court imposed and stayed execution of a 10-year sentence and a 20-year sentence for the other firearm enhancements (§ 12022.53, subds. (b)- (c).)

DISCUSSION

I

*Delayed Disclosure and Loss of Surveillance Video*

Defendant complains the prosecution failed to disclose until mid-way through the second trial that Hastings called police days after the shooting to report he saw a third party who looked like the shooter and had a similar SUV at a gas station. He also complains that the police lost the surveillance video. Defendant argues these defects

7

compromised his rights to due process of law, to present a complete defense, and to effective assistance of counsel. He says the sanctions the court imposed on the prosecution were inadequate.

However, defendant offers no argument about right to counsel or to present a complete defense, nor did he raise these points in the trial court. He merely cites the federal Constitution and two cases, but without discussion. (*Missouri v. Frye* (2012) _ U.S. _ [182 L.Ed.2d 379] [counsel was deficient in failing to tell defendant about plea offer]; *Crane v. Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636 [exclusion of circumstances of defendant's confession, on ground voluntariness was resolved in pretrial ruling, deprived defendant of fair trial].) Accordingly, defendant has forfeited these points. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).)

On appeal, as in the trial court, defendant's focus is due process. (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*) [prosecution's duty to disclose potentially exculpatory evidence]; *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281] (*Youngblood*) [police failure to preserve evidence "potentially useful" to defense does not violate due process absent bad faith]; *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] (*Trombetta*) [evidence must possess *both* exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means].)

We explain there was no finding of bad faith warranting a sanction for failure to preserve the video, defendant was able to obtain comparable evidence of the video by other means, and the sanctions the trial court imposed on the prosecution were adequate to defeat defendant's due process claim.

A.    Background

At the preliminary hearing in April 2010, three months after the shooting, Detective Parrott testified but was not asked about Hastings. An initial trial date was

8

vacated in August 2011 before a jury was selected because Nick Patti provided "new information" that was a "bombshell" which both sides needed time to investigate. Patti was not called as a witness at the first trial.

At the first trial in November 2011, Hastings and Parrott testified as prosecution witnesses, but neither mentioned that the police took Hastings to view a silver Montero on the night of the shooting, or that Hastings contacted police about the man at the gas station.

After the first trial ended in the hung jury, the second trial took place in March 2012, with the same retained defense counsel but a different prosecutor. In discussing evidentiary rulings, the defense complained it felt forced to temper its portrayal of the victim's character for violence in the second trial, because the court indicated it might then allow the prosecution to present evidence of defendant's character for violence in the form of a video showing defendant assaulting someone in jail two days ago.

In the second trial, the prosecution rested its case without calling Hastings or Parrott to the witness stand. However, after a recess, the prosecutor told the court he had learned that potentially exculpatory evidence had been withheld from the defense. The information came to light when the prosecutor re-interviewed Hastings on March 1, 2012, and Hastings mentioned he called police days after the shooting to report he saw the suspect and the SUV at a gas station. The prosecutor checked with police, who found no such report.

That morning, however, a district attorney's investigator, William Proffitt, was reviewing a tape of Hasting's statement and heard Hastings say at the end of the tape, "I saw that vehicle a week later and called your sergeant [Rob Merrifield] and gave him the license plate number." No one had previously checked with Merrifield, but the prosecution did so now and learned Merrifield remembered writing a supplemental report about it. Police produced the report, which had not been placed in the central file, and which stated Hastings called two days after the killing and said he believed he saw the

9

shooter walking at the gas station before Hastings spotted the vehicle and reported, "I knew it was him." Merrifield obtained the gas station surveillance video. The vehicle in the video was the Lara vehicle that police had driven Hastings to see the night of the murder, at which time Hastings was unable to identify it as the suspect vehicle. The prosecutor admitted to the court that the video, which should have been disclosed to the defense, was now missing. Apparently, the person in the video was Rafael or Erick Lara. Erick Lara was now in prison, having been convicted a few months earlier for a drive-by shooting using a .38 caliber revolver.

Defense counsel initially said he would seek dismissal or retrial but later, in response to direct inquiry from the court as to what the defense wanted, counsel said he was requesting a mistrial, because the withheld evidence might have led to an acquittal in the first trial where eight jurors considered defendant not guilty.

The court ruled the evidence should have been disclosed to the defense as potentially exculpatory evidence of third-party culpability. After a continuance, the prosecutor reported Erick Lara had been contacted in prison but refused to talk. The defense wanted time to interview a different prisoner who had inculpated Erick Lara on another matter and to develop evidence of ties between Bridget and Lara.

The trial court held a hearing outside the jury's presence, in which the law enforcement officers testified to their lax performance consistent with their later testimony in front of the jury.

The trial court asked defendant whether he agreed with his attorney's request for a mistrial. Defendant said no, he wanted the trial to proceed. Defense counsel said it was against his advice.

The trial court found elements of a *Brady* violation in the failure to provide the defense with Hastings's statement to police and failure to preserve the video. The court believed Parrott did not see Merrifield's report until the previous week, but Parrott had known about and viewed the video in January 2010, and the police lost the tape and

10

failed to provide the information about the report or the video to the prosecutor. The court nevertheless ruled defendant could receive a fair trial, and the violation did not rise to the level warranting a mistrial for prosecutorial misconduct. "It appears that the failure to provide the report of Sergeant Merrifield was negligent on the part of the Chico Police Department . . . ." But the information contained in Merrifield's report was now available to the defense. Because Hastings and police who viewed the video were available as witnesses, the failure to preserve the video would not result in the loss of a fair trial.

The trial court would not declare a mistrial but did fashion remedies: As a nonexhaustive list of sanctions against the government, the trial court offered to entertain a defense request for additional time to investigate, allow the defense to make an opening statement to the jury limited to the new information, instruct the jury about the police failings pursuant to CALCRIM No. 306, and consider a request to exclude evidence of Parrott's observation of the video.

Defense counsel said he would give an opening statement and wanted the jury instruction. Counsel would not ask the court to exclude evidence of Parrott's viewing of the video. Nor was he asking for any other remedies "[g]iven the Court's previous ruling." He was not asking for time to investigate, because he could not possibly accomplish what he wanted in a short time frame. The court offered to ask jurors about their availability for a longer continuance. Defense counsel said it would take two weeks for the prison to allow him access to a prisoner, and a delay that long seemed unfeasible. The prosecutor indicated a willingness to try to expedite access. Defense counsel replied, "from a strategic standpoint, as I sit here, if we're going to go forward with this trial, I would prefer to do it today."

The trial court also ruled defendant could present evidence of Erick Lara's conviction for shooting a .38 caliber gun, and it was presented to the jury by stipulation.

11

The trial court told the jury it was allowing defense counsel to give an additional opening statement because "there has been some additional information provided to the defense recently in this case."

The defense called Proffitt and Hastings as trial witnesses, as recited above.

The trial court instructed the jury with a modified CALCRIM No. 306:

"Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the change to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.

"The Chico Police Department did not provide to District Attorney Nelson Sergeant Merrifield's Report until Friday, March 16, 2012. This report included Sergeant Merrifield driving Mr. Edward Hastings to Roads Terrace to view a Silver Montero SUV on the night of January 2, 2010. The report discussed receiving a telephone call from witness Edward Hastings on January 4, 2010 and reporting an alleged sighting of the person and vehicle he identified as leaving [the crime scene] on January 2, 2010. The report also discussed Detective Hoffman obtaining a copy of a business surveillance recording of the AM/PM parking lot . . . where Mr. Hastings reported seeing the person and vehicle he identified as leaving [the crime scene]. The Chico Police Department viewed but did not preserve the business surveillance recording . . . .

"The attorney for the People failed to disclose Sergeant Merrifield's Report within the legal time period.

"In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

12

B.     Analysis

1. *Brady*

On appeal, defendant argues the delayed discovery violated not only *Brady* but also section 1054.1. However, he did not assert a statutory violation in the trial court. The constitutional duty imposed by *Brady* is independent of, and to be differentiated from, the statutory duty imposed by section 1054.1. (*People v. Bohannon* (2000) 82 Cal.App.4th 798, 804, overruled on other grounds in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135.) Even assuming a statutory claim would nevertheless be preserved for appeal, defendant's appellate brief merely says the statute requires disclosure of all relevant witness statements. He offers no legal analysis for application of the statute to this case, and we therefore need not address the statutory claim. (*Stanley, supra*, 10 Cal.4th at p. 793.)

As to the constitutional claim, defendant does not argue the trial court erred in denying a mistrial. He argues the sanctions fashioned by the court were inadequate, entitling him to reversal of the conviction and dismissal of the charges.

*Brady* imposes on the prosecution a constitutional duty to disclose exculpatory information to the defense (*Brady, supra*, 373 U.S. 83), including information known only to police investigators acting on the prosecution's behalf. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437-438 [131 L.Ed.2d 490]; *In re Brown* (1998) 17 Cal.4th 873, 879 & fn. 3 (*Brown*).) *Brady* imputes to the prosecutor information known to police investigators involved in the case, and responsibility for *Brady* compliance lies exclusively with the prosecution. (*Brown, supra*, 17 Cal.4th at p. 878.) The duty to disclose is violated even if the prosecutor's failure to do so was negligent or inadvertent. (*Ibid.*; *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1381.)

To establish a *Brady* violation, a defendant must show (1) the evidence at issue is favorable to the accused, either exculpatory or impeaching; (2) the evidence was

13

suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [144 L.Ed.2d 286] (*Strickler*); *People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)  "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.'  [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]"  (*Salazar, supra*, 35 Cal.4th at p. 1043.)  "The requisite *reasonable probability* is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court.  It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract.  [Citation.]"  (*People v. Dickey* (2005) 35 Cal.4th 884, 907-908.)  A discovery violation is not necessarily a due process violation.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 474.)

On review of a *Brady* issue, conclusions of law or mixed questions of law and fact, such as the elements of a *Brady* claim, are subject to independent review.  (*Salazar, supra*, 35 Cal.4th at p. 1042.)  Findings of fact, though not binding, are entitled to great weight when supported by substantial evidence.  (*Ibid*.)

A threshold point not addressed by the parties is whether *Brady* applies at all, because the defense knew all along that Hastings was a witness and presumably had the opportunity to talk to him.  Had the defense conducted its own investigation with diligence, it could have discovered that Hastings thought he saw the suspect at the gas station days after the shooting and reported this sighting to the police, which could have led to discovery that police followed up by obtaining the video.  " '[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and

14

presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.' [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) That is the case here.

But, even assuming for the sake of argument that defendant nevertheless has a *Brady* claim, it fails. Despite the People's argument that the challenged evidence was not exculpatory, it was at least arguably exculpatory. What we find lacking is prejudice.

Without mention of defendant's lack of investigative diligence and the *Morrison* case, the trial court found "there has been a *Brady* violation in as much as the evidence of the interview with Mr. Hastings by Sergeant Merrifield was not provided to the defense in a timely fashion. And the video surveillance . . . was not preserved." However, the trial court did not make an express finding of prejudice which is a required element of a *Brady* violation. (*Salazar, supra*, 35 Cal.4th at pp. 1042-1043 [strictly speaking, there is no *Brady* violation unless there is prejudice].)

But even if the trial court had expressly found prejudice, the sanctions imposed by the court cured it. Keeping in mind that "prejudice" in the *Brady* context requires a showing that there is a *reasonable probability* of a different result had the prosecution disclosed the material in a timely fashion, that is, a probability sufficient to undermine confidence in the outcome on the part of the reviewing court, that showing has not been made here. Defendant not only got to present all the evidence of Hastings's sighting at the gas station of a possible suspect who was not defendant, but defendant also got to make a supplemental opening statement, a very favorable jury instruction, and have the jury know of the casual performance by the police. Although the video was lost, the jury heard police testimony that the person depicted in the video was not defendant but rather Rafael Lara, and photographs of Rafael and Erick Lara were introduced into evidence.

Moreover, there was overwhelming evidence of defendant's guilt. Bridget Castillo witnessed the murder close up and positively identified defendant, whom she had known for years, as the killer. Though she said she was looking at her phone the instant

15

the shot was fired, she told her brother that night that she saw the muzzle flash. In either case, she saw defendant put the gun away, stand close to the victim who was shot at close range and be unsurprised by the gunfire. Additionally, Nick Patti, the person neighbors observed on the sidewalk being yelled at by the SUV driver, knew defendant and identified him as the driver of the SUV as it was being driven away.

Defendant argues Bridget's testimony was doubtful, because she claimed not to know about the marijuana business despite being given immunity. But the jury obviously believed her testimony about the shooting and was entitled to do so. Defendant insinuates Patti was not credible because he appeared with "a new story" before the first trial, and the prosecution did not call him as a witness at the first trial. However, the record shows only that Patti appeared with "new information" and does not support defendant's insinuation.

Defendant complains the prosecutor in closing argument attempted to minimize the government misconduct and Hasting's testimony. Well, of course he did, that was his job. Defendant argues the prosecutor acted as an unsworn witness by telling the jury he was the one who brought forward the withheld information, and he and the police felt bad about it. However, defendant did not object in the trial court and therefore cannot raise the point on appeal. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1238.)

Defendant argues he was prejudiced because his *first* jury deadlocked eight-to-four for acquittal and, had the Hastings evidence been presented to the first jury, the first jury may have acquitted him, or more jurors may have voted for acquittal so as to dissuade the prosecution from re-trying the case. Defendant cites no authority for such retrospective analysis. The People cite a non-*Brady* case recognizing as a general proposition that in some cases it may be "persuasive that the first trial ended in a hung jury when deciding whether the error that occurred in the retrial was prejudicial." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520.) The People argue the two trials are not comparable, because some evidence and theories differed. We need not compare the two. *Soojian* held that

16

when a defendant moves for new trial based on new evidence, he meets his burden to show a different result probable if he shows at least one juror would probably have voted to find him not guilty had the new evidence been presented, because a hung jury is a better result than a guilty verdict. (*Id*. at pp. 520-521.) Even assuming *Soojian* applies, a hung jury with nine or more votes for acquittal is not a more favorable result than a hung jury with eight votes for acquittal. It is speculative to say the prosecution would have given up or defendant would have won 12 votes for acquittal. Speculation is not sufficient for reversal. (*People v. Hoyos* (2007) 41 Cal.4th 872, 922.) The " 'mere possibility' " that undisclosed information might have helped the defense or affected the outcome does not establish materiality in the constitutional sense. (*Ibid*.)

The need for a second trial did not deprive defendant of Hastings's recollection because, even at the first trial, Hastings had problems with his memory. In the first trial Hastings was forthright about being "inebriated" that night, having consumed a pint of whiskey "pretty quick" and two marijuana joints and having a "good buzz on," and not being able to remember some things because he was "inebriated." When asked at the first trial if he remembered what he saw, Hastings testified he had just reviewed the police report of his statement. Some of his perceptions were wrong or unhelpful to the defense. The SUV in the gas station video was the same vehicle Hastings was unable to identify for police the night of the murder. And Hastings testified in the first trial that he believed the person who ran away from the SUV (Patti) was the same person Hastings saw lying dead on the ground.

We conclude the sanctions imposed by the trial court were adequate. There was no prejudice, hence no *Brady* violation, hence no need for reversal.

### 2. *Youngblood* and *Trombetta*

Under *Trombetta, supra*, 467 U.S. 479 [81 L.Ed.2d 413], in order to find a due process violation in the government's failure to preserve evidence, the evidence must

17

*both* possess exculpatory value that was apparent before it was destroyed *and* be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. (*Id*. at pp. 488-489; *People v. Alvarez* (2014) 229 Cal.App.4th 761, 772 (*Alvarez*).) Under *Youngblood, supra*, 488 U.S. 51 [102 L.Ed.2d 281], the police failure to preserve evidence "potentially useful" to the defense does not violate due process absent bad faith. (*Id*. at p. 58; *Alvarez, supra*, 229 Cal.App.4th at p. 773.)

It is not clear that defendant affirmatively argued *Youngblood* or *Trombetta* in the trial court. The court spoke only of *Brady*.

In any event, we review a trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard. (*Alvarez, supra*, 229 Cal.App.4th 761, 774 [trial court's dismissal of charges was proper as to two defendants because police in bad faith failed to preserve video allegedly showing that an officer repeatedly encouraged the victim to point the finger at the two defendants].)

Even assuming the matter is not forfeited, defendant fails to show grounds for reversal of the judgment. Defendant on appeal claims the government engaged in "flagrant and egregious" misconduct warranting reversal of the conviction and dismissal of the charges. Defendant says that, when the government engages in misconduct, it is the People's burden to show that sanctions are not warranted because there was no prejudice. He cites *People v. Zapien* (1993) 4 Cal.4th 929, 967, where the prosecution intentionally destroyed a tape recording prepared by the defense. The arguments fail on multiple fronts. First, the defense did not ask the trial court for dismissal. Although defense counsel initially told the trial court he would ask for dismissal or mistrial, when the trial court later asked what the defense wanted, counsel's response was "mistrial." Second, the trial court *did* impose sanctions. Third, the trial court did not find flagrant and egregious government misconduct. Contrary to defendant's perception that it is

18

inconceivable that the police did not act in bad faith, the trial court made no finding of bad faith, as opposed to mere negligence.

In the absence of a finding of bad faith, defendant fails to show a *Youngblood* violation. As to *Trombetta*, defendant fails to show a violation because, although the exculpatory value of the evidence was apparent before the police lost the video, the trial court found, and defendant was able to obtain, comparable evidence by other reasonably available means, i.e., the police testified the man in the video was not defendant, and the jury was shown photographs of Rafael and Erick Lara, the person(s) police said was shown in the video.

We conclude the government's failure to disclose and preserve evidence does not warrant reversal of the judgment.

II

*Admission of Gun into Evidence*

Defendant complains the trial court improperly allowed into evidence the .357 caliber gun found in his car upon his arrest, because there was no proof it was the gun used in the murder. Defendant argues the evidence was not relevant, should have been excluded under Evidence Code section 352 as more prejudicial than probative, and violated his federal constitutional right to due process. We disagree.

A.    Background

Before the first trial, defendant sought exclusion of the gun found in his vehicle. The prosecutor said Department of Justice analysis could not prove it was the murder weapon but, based on the bullet holes in the victim's head, the gun was consistent with the range of calibers that might have caused the victim's death. The trial court found the probative value was not outweighed by prejudicial effect of the evidence under Evidence Code section 352. Defendant later revisited the issue, arguing the bullets in the gun

19

found in his car were "hollow point" which expand and would leave a larger exit wound than the victim's exit wound.

Still during the first trial, the prosecutor acknowledged it was possible the gun was not the one used in the murder because a witness made a statement that defendant disposes of a weapon after he uses it and gets a new one, but the gun was consistent with the murder weapon. The trial court again ruled the evidence admissible. The pathologist testified the wounds were not necessarily inconsistent with hollow point bullets, because a bullet may hit some material or tissue that plugs the hollow point, thwarting the bullet's expansion.

In later discussing Nick Patti's testimony, the first prosecutor said Patti would testify defendant gets rid of a gun after he uses it. The prosecutor said, "I think that's relevant because [defendant had a loaded revolver consistent with the murder weapon when arrested and] . . . he likes to use a revolver because it doesn't leave a case. That was sent to [Department of Justice] and there's no indication that it was the gun used. *In fact it probably isn't the gun that was used to skill [sic] [the victim]* and that's consistent with the defendant after he uses a gun he gets rid of it." (Italics added.) The trial court asked why defendant's habit and custom of tossing firearms was admissible. The prosecutor said habit and custom was inadmissible unless the door was opened, so the prosecutor withdrew the request to have Patti testify about defendant's habit of tossing guns unless the defense opened the door.

In the second trial, over defense objection that there was no evidence linking the gun to this crime, the new prosecutor argued and the trial court ruled the .357 caliber revolver found in defendant's car was admissible because it was "consistent with the [range of] caliber" of the gun used in shooting the victim.

At the second trial, the prosecution expert opined the bullet that killed the victim was from a medium caliber revolver of approximately .9 mm., .38, or .357 caliber. Patti testified defendant had a silver revolver minutes before the shooting. Nathan Castillo

20

testified his sister Bridget said she saw a "silver flash."  Police who arrested defendant a week after the murder found in his car a silver, stainless steel .357 caliber revolver.

B.    Analysis

Contrary to defendant's view, the first prosecutor's comment that the gun was probably not the murder weapon, does not constitute a concession that the evidence was inadmissible and did not bind the second prosecutor's evaluation of the evidence.  The second prosecutor argued the gun was consistent with the murder weapon and adduced evidence to that effect.

Evidence of the gun found in defendant's car was admissible because there was evidence it could have been the murder weapon.  "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed.  There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon.  [Citations.]"  (*People v. Riser* (1956) 47 Cal.2d 566, 577 (*Riser*), overruled on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98; and *People v. Morse* (1964) 60 Cal.2d 631, 648-649.)

*Riser* went on to say that, when the prosecution relies on a specific type of weapon as the murder weapon, it is error to admit evidence that other weapons were found in the defendant's possession, because such evidence tends to show, not that he committed the crime, but that he is the sort of person who carries deadly weapons.  (*Riser, supra,* 47 Cal.2d at p. 577; see *People v. Mills* (2010) 48 Cal.4th 158, 197 [*Riser*'s holding on this point does not apply where prosecution does not rely on a specific weapon].)  *Riser* held the trial court erred in admitting into evidence a Colt .38 revolver found in the defendant's possession, where the prosecution witness established the murder weapon was a Smith and Wesson .38 Special revolver.  (*Riser, supra*, 47 Cal.2d at p. 577.)  However, the error was not prejudicial because shells and a holster were properly

admitted and from these the jury would have concluded the defendant possessed firearms. (*Id*. at pp. 577-578.)

Defendant suggests cases such as *Riser* are not authoritative because they predate enactment of Evidence Code section 352, which became operative in 1967. However, Evidence Code section 352 codified common law principles. (*People v. Fitch* (1997) 55 Cal.App.4th 172, 181; see also, *People v. Ford* (1964) 60 Cal.2d 772, 801 [trial court abused discretion in failing to weigh probative value of autopsy photos against prejudicial effect].)

As to Evidence Code section 352, defendant on appeal offers no analysis that the gun should have been excluded as more prejudicial than probative. He merely cites inapposite cases where appellate courts upheld trial court's exercise of discretion in excluding speculative evidence proffered by the defense. (*People v. Stitely* (2005) 35 Cal.4th 514, 547-548; *People v. Holloway* (2004) 33 Cal.4th 96, 133-135.) Defendant argues these cases stand for the proposition that the trial court is not required to admit every piece of evidence that makes the defendant look bad, and that is what happened in this case. However, cases upholding trial court discretion to exclude evidence do not compel or even support reversal of trial court discretion allowing evidence. Moreover, evidence that defendant had a gun when arrested was not more prejudicial than probative, in light of the eyewitness testimony that defendant fired a gun at the victim at close range.

Since there was no evidentiary error, we need not address defendant's argument that error was prejudicial because the prosecutor's argument to the jury -- that the gun in defendant's car was consistent with the murder weapon -- asked the jury to draw an unwarranted inference the prosecutor knew was not likely to be true.

III

*Uncharged Misconduct*

Defendant complains the trial court improperly allowed evidence that he participated in three uncharged offenses (robbery outside Scott's apartment, assault and robbery at Patti's apartment, and threatening Patti at gunpoint on the street) under Evidence Code section 1101.

A.      Background

At the first trial, the prosecutor said he was giving Nick Patti use immunity for the December 9, 2009, robbery, and the uncharged offenses were admissible to show defendant's motive for this shooting was anger that the victim had not paid his debt to defendant's brother Scott for help setting up the December 9th robbery.  The trial court ruled the evidence was inflammatory but more probative than prejudicial and would be admitted.

The trial court reaffirmed the ruling for the second trial, viewing the evidence as highly relevant to motive, not unduly prejudicial, and not likely to consume excessive time.

The trial court instructed the jury on the limited purpose of this evidence to show motive.

B.      Analysis

Evidence Code section 1101 provides in part:

"(a)  Except as provided in this section and Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

23

"(b)  Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . .) other than his or her disposition to commit such an act. . . ."

"The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence." (*People v. Carpenter* (1997) 15 Cal.4th 312, 378-379, superseded by statute on other grounds as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)  "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis.  [Citations.]'  [Citations.]  'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.'  [Citation.]"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

We review the trial court's  ruling under both statutes (Evid. Code, §§ 1101, 352) for abuse of discretion.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.)

Here, the evidence had substantial probative value to explain a motive for an otherwise unexplained attack.

Defendant argues the prior bad acts were admitted only to show motive, and "it is doubtful that appellant's dismay with Patti and Abrahamian for their failure to repay Scott led to the fatal shooting."  Defendant views this prosecution theory as "doubtful" because defendant supposedly recovered more than the amount owed when he stole the marijuana from Patti, and defendant did not kill Patti at that time but only hit him. However, there was no evidence of the value of the marijuana defendant took from Patti or that it could cover defendant's debt.  Moreover, defendant's self-serving doubt would

24

not prevent the jury from concluding that, regardless the value of the marijuana, there remained the issue of the victim's failure to honor the debt voluntarily.

Defendant argues the evidence was not highly probative, because it went to motive, and motive is not an element of murder. However, " '[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

Defendant argues the evidence of his prior acts was only tangentially related to the issues in this case and was inflammatory and prejudicial, because "no one saw appellant fire the fatal shot" and no weapon linked defendant to the offense. This argument falters on its disingenuous premise that no one saw defendant kill the victim. Bridget saw defendant and the victim together, saw defendant was agitated, saw a silver flash on defendant's person and heard a gunshot, saw the victim fall to the ground, saw defendant put the silver item away, saw defendant was not surprised by the gunfire, and saw defendant walk away from the bleeding victim. The forensic evidence showed the victim was killed by a gunshot fired from close range, not more than three feet. There was no evidence of anyone other than defendant that close to the victim. Evidence of defendant's guilt was overwhelming.

Defendant argues crimes against children are especially inflammatory. However, he cites no evidence as to the ages of the "kids" who went to Scott Ortiz's door. Patti referred to them as "guys," which suggests they were not young children.

Defendant cites inapposite case law where materiality was tenuous. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 715 [prior thefts improperly admitted without connection to instant crime]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 226-228 [gang evidence improperly admitted where there was no evidence the motive of the charged offense was gang-related].)

25

This case is more similar to the murder case of *People v. Butler* (2005) 127 Cal.App.4th 49 (*Butler*). There, the trial court allowed Evidence Code section 1101 evidence to explain the defendant's motive for an otherwise unprovoked attack. (*Id.* at p. 61.) The uncharged misconduct occurred five days before the killing, at a party on November 16th. A group of friends was approached by a stranger (the defendant), who argued with one and punched another for "looking at" the defendant. (*Id.* at p. 52.) The defendant left the party. Some of the group chased after him, but he got away. As the group headed home in a car, they saw the defendant coming down the street with a gun in his hand. (*Id.* at pp. 52-53.)

Five days later, some of the group was standing at a bus stop when the defendant walked up with two companions and asked one of the victims, 14-year-old Clive, if he remembered the defendant. Clive said no. Defendant hit him, starting a fight. Defendant reached into his shirt for a gun. The group ran. (*Id.* at p. 53.) They heard gunshots but did not see who was doing the shooting. Clive suffered 10 gunshot wounds and died. A bystander saw the shooter was the man with the ponytail. Only the defendant had a ponytail. (*Id.* at pp. 53-54.) Another witness told colleagues that defendant was the perpetrator but at trial denied having so stated. The colleagues testified to her prior inconsistent statement. (*Id.* at p. 54.) The trial court allowed the prosecution to use the November 16th incident as relevant to prove motive. (*Id.* at p. 60.) The appellate court affirmed. There was a direct relationship between the two incidents. (*Id.* at p. 61.) In each, the defendant had a dispute with members of the same group of friends. The defendant was chased away from the party but returned brandishing a weapon. At the bus stop, defendant hit Clive without provocation. The incident at the party was relevant to explain the defendant's motive for the otherwise unprovoked attack on Clive. It was properly admitted as more probative than prejudicial in light of the more serious nature of the later shooting. (*Ibid.*)

Defendant's reply brief argues *Butler* is distinguishable because there the motive for revenge was much clearer. However, defendant again relies on his self-serving assumption, unsupported by evidence, that the marijuana defendant took from Patti satisfied the victim's debt or that forced recovery of the debt necessarily forgave the disrespect shown by failure to pay it voluntarily.

Defendant's reply brief cites *People v. McWhorter* (2009) 47 Cal.4th 318, where the defendant murdered his neighbor and her son during a robbery. The defendant complained the trial court would not let him introduce evidence that the neighbor feared her ex-husband who had been convicted of misdemeanor spousal abuse. The defendant wanted to use this evidence to argue the ex-husband committed the murders for the possible motive of terminating his child support payments. (*Id*. at pp. 367-368, 371-372.) The Supreme Court held the evidence was properly excluded because it was speculative as to motive. (*Id*. at p. 372.) Here, in contrast, the evidence was not speculative.

We conclude the evidence of uncharged offenses was more probative than prejudicial and was properly admitted under Evidence Code section 352. We therefore need not address defendant's argument that the evidence denied him fundamental fairness under the federal Constitution. (*People v. Rundle* (2008) 43 Cal.4th 76, 109, fn. 6 [rejection on merits of claim that trial court erred on issue actually before that court necessarily leads to rejection of newly raised constitutional "gloss" as well], overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

DISPOSITION

The judgment is affirmed.

      HULL      , J.

We concur:

      BLEASE      , Acting P. J.

      NICHOLSON      , J.